Participating by video. I just want to do a sound check and make sure you can hear us. Yes, your honor. Okay, great. Just one more minute here. People are getting set up. Okay, I think we're ready for your argument, please. Good morning, your honors. May it please the court. Catherine Balafat appearing for Appellant Harbor Performance Enhancement Center LLC, which I will refer to as HVAC. I would like to reserve five minutes for rebuttal. That's fine. I plan to discuss two broad topics before turning the virtual podium over to my co-counsel, Ms. Ravalli. I want to start with the North Pennington issues and then move to the dismissal of HVAC section 1983 claim against the city defendants. With respect to North Pennington, there are three fundamental errors the court made in dismissing HVAC's NLRA and NHS claims on the basis of North Pennington immunity. The first one was how the court treated the union's threats and coercions of the court as all protected petitioning activity. It is our position that threats and coercion are not protected petitioning activity. Threats to do lawful things would be immune, such as the threats to lobby, which were found in the Evans Hotel case or the threat to not support board members as in franchise realty. But we submit that threats to do unlawful things, things that the union has no right to do, which is to stop work or to picket, that those are unlawful. Can I ask counsel, what's your strongest authority for the proposition of the activity, the alleged activities here across the line? So I would refer the court to the NLRB versus Ironworkers Local 433 case, a Ninth Circuit case in which this court had the occasion to consider whether or not a union had the right to do a secondary picket of a high school. And in that opinion, the this circuit said that the First Amendment does not afford unbridled protection for threats, coercion, the kind of activities that are prohibited under Section 84 to little I. Which case, which case were you referring to there? That's NLRB versus Ironworkers Local 433. It's the site is 891 F3D 1182. That's a 2018 decision of the Ninth Circuit. OK, great. But I think that is consistent with the treatment of free speech rights as not including threats and coercion under Section 84 to little I, and that's consistent with FTC versus Superior Court Trial Lawyers Association, which is a Supreme Court case in which the DC bar that represented indigent persons, they instituted a boycott as a means to influence government policy. They wanted a pay raise from the city council. And the Supreme Court said you can't use a boycott as a means to influence the government. Right. But this was not a boycott. I mean, this is I think the issue here is how are the threats as pled imminent or sufficient or concrete enough that they would surpass Norr Pennington, which sort of bevels off that statute a little bit due to the First Amendment concerns that we have in this area? Yes, Your Honor, I think that's a valid concern, and I think that HVAC has adequately pled sufficient facts that rise to a plausible claim of threats and coercion. What do you want to connect? Forgive me for interrupting, but what are your strongest facts? Just to flesh out that point. So the union threatened to start a war and it wasn't just an idle threat. They then held a war council for the first time in 50 years. The war meaning war, meaning work stoppage or labor disruption in the port. And I think that's how I understand it. And that's how I think the key point is how the executive director of the port side. He was so concerned about what the IOW was threatening to do to the port. He referenced the 2002 lockout, which led to economic loss for the port. They lost their market share market share. I apologize. They he specifically referenced repeatedly that he was worried that no beneficial cargo owner would touch the port. And I think we all know what happens when the supply chain is disrupted at the port. And that is what the director of the port was concerned by the fact what the IOW was telling him. Right. And so it led him to pull HVAC related matters from the board. It led him to breach HVAC's permit. My client had a permitted pilot project that had been approved by the board. And the executive director said, you cannot operate. He breached that contract. He was so worried because he said, we'll have 15000 longshoremen marching on your property. And so I think so. So those are the allegations. Yes. And I appreciate their serious allegations. I'm going to deem all of them is true for purposes of this question. And if we could circle back your strongest support for the notion that your contention that that crosses the line and exceeds the scope of North Pennington immunity is is it is it the iron workers case? It's the iron workers case. It's the FTC case. I think it's consistent with Claiborne hardware. And I see it rapidly running out of time. And I was hoping to cover other topics as well. But I think even if you don't agree with the proposition that threats and coercion are protected petitioning activity following this court's analysis under Sosa versus Direct TV, you need to look at what the statute is intended to prohibit and determine whether or not HVAC has alleged sufficient facts that rise to the level of plausible claim, which we obviously say that we do. And you look and see whether or not if that if the conduct alleged so squarely falls within the prohibitions of Section 84 to little I, then North Pennington can't immune can't can't apply to the claim. And so that's one error, we believe, that the court made in its analysis. Then there's the sham petitioning, which I believe is inappropriate for resolution at the at the stage of the proceeding or act. Then there's the conduct that was directed specifically at HVAC that we think under. Various case law, Cooper versus Southwest, that we said in our brief is not covered. The last point of and United Nurses Association of California, which this court said Supreme Court has not extended Northening and immunity to protect incidental conduct. So the wrongful acts that were directed at my client. Those should not be immune. And then the last point I want to make before I turn the virtual podium over to Mr Valley is under the section 1983 claim. I think the city defendants claim. I runs a foul of Golden State, the two Supreme Court decisions. It's clear that my client has rights under the NRA, either as a person. If you're looking at subsection to little I'd be or as an indirect employer under subsections eight and D. And with that, I will reserve them my remaining time. Thank you. And I'm going to turn it over to Mr Valley to address the district court's dismissal of the breach of contract and breach of the covenant of good faith claims relating to the memorandums of understanding and the exclusive amendment to the exclusive negotiating agreement. And let me start with the memorandum of understanding. We set forth in our papers, the district court really in a cursory one paragraph ruled that the memorandum of understanding the MOUs are unenforceable relying on one Sentence in the entire contract and both sides agree and California law is clear that contracts must be construed in their entirety. All the provisions must be considered I think that argument is well taken. So walk us through, if you would, in your, you know, brief time here, how it should have been analyzed. So if you look at this agreement in full context. There are two key aspects to it. One is the terms of a proposed lease are set forth in the MOU. And the MOU makes clear that those terms are not binding. They can't be binding their intended terms. That's where the unenforceability concept shows up. And when you look at the specific provisions you see the terms are not binding. Separately, there is a provision to negotiate in good faith and the city can only terminate the MOU if the project is infeasible. So if you, the only way to construe all of the provisions together and to make common sense is to View the agreement as confirming that the lease terms, even though they're set forth here are non binding. You need a sequel. You need many conditions to getting that lease in place. But the commitment to negotiate in good faith is a enforceable agreement and California law in many cases affirms that an agreement to negotiate in good faith. Separable agreement. So that's how it should be interpreted and at the motion to dismiss days to just take one sentence and rule the entire agreement on enforceable you think is error. Moving on to the exclusive negotiating agreement. In the exclusive negotiating the amendment to the exclusive negotiating agreement, we're relying on estoppel. The port director signed the amendment. The deputy city attorney signed the amendment. They represented that they would get the approval of the city council and What happened, we now know is because of the union coercion threats and pressure. They refuse to even bring the matter up to the board. They refuse to even Continue negotiating unless we agreed to meet our client agreed to meet the union's demands. How do you rely on it, though. Council that the other signature line that was, you know, remained blank is on the same page. So you're, you're not arguing. I don't think that your client thought it was signed. Are you No, no. And I think I would I would refer the court to the HPT city of Anaheim case. I think it's it's quite analogous. In that case, the The city approved a conditional use permit. To the to the plaintiff developed and they made representations that they were going to build a two story parking structure. It's not a contractual commitment in the permit. And there was no approval and the defendant ended up not building the structure and the defendant said, well, we would have required city council approval or a charter city. A tough luck, essentially, and the court said, no, this is where a stop will applies you induce reliance. They were ignorant of the fact that you had Changed your intention or didn't have exactly. And that's the problem. I've got if I could focus your attention on that case. That's why it strikes me, sir, is being so very different than what you had here that, you know, from the get go. It seems to me that the picture that's painted here is that Is that the port was trying to get the developer to talk with the union to work out this problem. It was certainly in the ports interest for this project to go forward. I don't think your client was ignorant of that tension was it. How does this not help you here. At the at the outset. No. When the agreement was signed the our client did not know that the union was going to make these demands and that the city was going to Know the union was supportive of the project at the outset and you've That very clearly. But then, of course, then the rubber met the road in there and you weren't kept out of that. Right. It seems to me that you were involved in and very aware of client was very aware of that. Push. Well, yes, we were the subject of the threats and coercion ourselves. Yeah. So how do you get there. Yeah. Well, I think it's very important that we bring that to the board to get it signed and the city because of what happened after we entered into the agreement refused to do so and we've alleged and set forth that they refuse to bring the issue to the board. It's very, that's why I think it's similar to city of Anaheim. They were they knew there was no parking structure built. Obviously, you could see no parking structure built what they didn't know was that the city had changed its mind and was refusing to And they were told that in closed session, the board had approved the amendment. So what happened is the city. Hang on, please forgive me. I think you've answered my question and I appreciate it. I just want to make sure my colleagues have an opportunity to ask whatever questions they have. I have one quick question. I know you're over your time, but I want to understand your position is that a stop all operates against the city. I want to be very specific against the city without proving that the city itself represented that it would sign the document. Well, it did represent who did the document. The document was signed by the city. Well, who by who the city attorney, the deputy city attorney, the deputy city attorney and the executive director of the port. And then they informed us that in closed session, the board had approved it and they informed us that they would bring it into open session for the board to approve it. It's very clear that this that the city is subject to a stop all in the appropriate case. The cases that the defendants site are cases where the. A stop all is attempted to go beyond the power of the person that signed, but the executive director had the power to bind the city for a one year exclusive negotiating period. So a stop all applies, I think. Perfectly, it's appropriate. It would be a grave injustice to have our clients spending all this money. When the board. Acted in bad faith. Thank you for your argument. You're two and a half minutes over your time. Not at all. We've taken over, but I do have to move on to give the other party a chance here, please. Thank you. Good morning and may it please the court. David Kesselman on behalf of the union defendants. Uh. Your honors, we respectfully ask the court to affirm the district court's ruling. We believe the district court got it absolutely correct in applying the Norr Pennington doctrine to dismiss both the Sherman Act claim and the NLRA claim that was raised by HPEC below. And the reason for that is straightforward. The district court applied a very long body of case law that makes clear that when engaging in lobbying and petitioning behavior, the First Amendment is extremely expansive, particularly when you're lobbying a political entity. Where the rough and tumble of politics allows for quite a bit of activity that might not otherwise be allowed, for example, before a judicial body. So are there are there any limits on the means of petitioning activity consistent with Norr Pennington? Yes, there are, Your Honor, and the sham exception is clearly the one limitation that case law is consistent on. There are some cases that also talk about independent unlawful conduct separate and apart from the petitioning. It's often treated the same way as sham. And so getting directly to the case law that was raised by the other side, the cases cited, for example, that FTC versus Superior Court Trial Lawyers Association from the Supreme Court, 1990, the reason that case does not apply is because you actually had separate, independent conduct from the lobbying itself. You had lobbying by the lawyers who wanted to have a higher wage for representing indigent defendants. But when that didn't work, then separate and apart, they engaged in actual conduct in a boycott. Right. So if if the if your clients here had made very imminent, very concrete, very specific threats, but but had not yet engaged in the conduct that they were threatening, would that be covered by Norr Pennington? I would say yes. Overstreet, this court's decision in Overstreet in the Ninth Circuit, has made very clear that we look at this conduct issue, conduct versus expression issue. And in analyzing the Supreme Court case law, Bartolo, B, E, and K, and other decisions, the clear point of demarcation is conduct. And where you get to that line where you have conduct that crosses over the line is obviously fact specific. We're nowhere near that here, your honors. We never got to the point. And it's in the second amended complaint. And Judge Gutierrez, the district court gave them an opportunity to amend to try to add additional facts that would put them within the sham exception, put them within the exception that addresses independent, unlawful conduct. They couldn't do it. These amorphous words about war or vague threats down the line. Case law is clear from Brown and Root, from Petrochem, from Overstreet. That's just not enough, given how important the First Amendment right is to petition. And I guess where I'm going with this is, I wonder whether there's some types of threats, I'm not sure this is his case, but whether there's some types of threats that don't involve conduct, but that are awfully close, that could still be a labor violation and that could still be unlawful, notwithstanding the First Amendment concerns. That's, look, that's possible. If you made a threat, I think, hypothetically, you're trying to raise is, what happens if I tell you I'm going to go strike in 15 minutes? Have we gotten to the point if I've got 200 people and it's going to be a strike, maybe on a set of facts like that, I'm not even sure because the court is so careful about ensuring that you have the right to expression and not crossing the line into conduct. And one of the big deficiencies in their allegations is that we don't even know what those quote-unquote threats would have looked like. There weren't even any employers yet specifically identified. We don't know whether or not the picketing, and you are allowed to picket a primary employer, that would have been lawful. We know from the case law only certain types of ambulatory picketing is unlawful. Bannering is lawful. So all of these amorphous and vague threats, they're just not enough to even get close to the line on this issue. Could I shift your focus a bit on the sham exception because you're one step drop down discussing its application and we've described the scope of it differently depending on the nature of the body being lobbied. Could you just take a minute and speak to that? Yes, absolutely, Your Honor. So the case law is clear. Sosa Coddle in particular addresses this distinction between a legislative or political body on the one hand, a judicial body or a body, an administrative agency that has judicial or quasi-judicial type procedures. Right, right. So is the distinction that we're looking at in this, first of all, is that disputed? Is the nature of the body disputed in this case? I don't think it really is. They made some reference to it in their papers below and in their opening brief. But ultimately, it seems pretty clear the way Judge Gutierrez analyzed it, and he is correct, that when you're dealing with an entity like the Port Board here, where there are no specific criteria, there's no opportunity for an APA type review, we've got a whole body of cases like Coddle that make clear, in that context, we're dealing with a legislative or political body, and the rules are different. If we're truly dealing with a purely legislative body, I think Judge Tsushima's decision makes that very, very clear. So going back to Coddle, there seems to be some play there, and maybe it's not contested here. I don't know that it really is. But it seems to me that if there were fuzziness there, the attribute we would be looking to, and this is a question, is the degree of discretion the entity would have. Do you agree with that, or are there other features of the body that might change the character for purposes of the sham exception analysis? Well, I agree with you, Your Honor, that it's the amount of discretion that the body has. And here, the allegations are clear that the Port Authority had full discretion. There was no sort of traditional judicial adjudicatory type process in place. So I don't think that body of case law even applies. Even if it did, I don't think that it changes, ultimately, the analysis in this case. But I don't think you even need to get there. If it did, I'll just take a little bit more of your time. If it did, and I don't know that it does, if it did apply, then I don't really see a misrepresentation claim. I'm thinking about the second Coddle exception, way of fleshing out the sham exception, having to do with a merits analysis. Because this isn't litigation where we can say the litigation failed or not. So how would we do a merits analysis here? It's not clear how you could do it. And this is the point of the case law. Basically, it's the rough and tumble of politics, as Franchise Realty says. Most anything goes in lobbying. And the Supreme Court has made that clear in the Omni case. I mean, the Omni case is definitive on this issue that you can basically engage in all kinds of misrepresentations. Justice Scalia even references bribery. That's not going to overcome the First Amendment right that's so fundamental to petitioning activity. So there's no allegation of bribery here. So we don't, I don't think, need to approach that. But there certainly are allegations about strong arm, that's my word, tactics, threats of opposing counsel, a war or a labor stoppage. That's what's at issue here. It is. But I guess my point is bribery is so much further beyond that, that if that is not enough to overcome NOR, then sort of these vague references to war or war counsel, that just can't be enough. Could you speak quickly to the contract claims? That's going to be counsel for the city.  Yes, Your Honors. Can I ask this on the NOR Pennington? Is the Brown and Root the most factually analogous case or is there some other case that you'd point to or in addition? I think Brown and Root is probably the most factually analogous from the Fifth Circuit, but Petrochem from the D.C. Circuit, which affirmed the NLRB board, that also is quite similar. And then I personally found quite instructive the analysis in Overstreet from this court on the distinction between conduct and expression and the way it marshals the Supreme Court decisions. And I guess in the last 20 seconds I have, I would just note for the court the policy concern here, because essentially what they are suggesting is if these types of statements in traditional lobbying or petitioning could give rise to a secondary boycott or an antitrust claim, then effectively that would stymie unions from being able to petition the court in future cases. I just think that cannot be the state of the law. We would ask you affirm. Thank you for your argument. Thank you, Your Honors. Good morning, Your Honors, and may it please the court. My name is Jennifer Meeker and I represent the city defendants who are the City of Los Angeles as well as the City of Los Angeles Harbor Department. It sounds like Your Honor does have a question about the contract claims, and so I'm more than happy to jump straight into that if that works for you. Yes, just it would save time for my hypothetical to assume that I agree with opposing counsel about relying on the unenforceability language, you know, just as a writ large because of the California case law on the point. So just assume, if you would, that this was a binding agreement to negotiate in good faith. Then at that point, why was it correctly dismissed? So I think, and I want to answer your question, if it's a binding agreement, which I disagree with. To negotiate in good faith. To negotiate in good faith. Not to lease something, right. Correct. I think under California law, there's a specific case called Copeland, which has been also discussed in Vestar, which is a Ninth Circuit case. And so again, assuming the agreement is valid, that the contract claims under the MOU still fail for the reason that there is no damages. Under Copeland, the HPEC is required to only, or is only entitled to assert a claim for reliance damages. And in this case, there are no reliance damages because in the MOUs, they have disavowed their right to recover expenses or costs. So my argument would be that even if you can get past the validity piece, which, and I will take a minute to tell you another reason why it's invalid, you still can't get past the fact that they disavowed their rights to any reliance damages. In the document itself. In the document itself. That's correct. What's your other reason for deciding that, or wanting me to decide that it's not binding, please? Of course. Yes. The other reason why the MOUs are just invalid, and you don't even have to get to the interpretation issue, is they weren't validly approved in accordance with the L.A. City Charter or the L.A. Administrative Code. This is also an indefinite agreement, just like the amendment is. And under the charter, as well as the admin code, it needed board approval in a resolution, in a publicly made meeting, or a public resolution. It needed city council approval, and it also needed to be signed by the city attorney. And none of those things happened with the MOUs. And so for the same reasons the amendment is invalid, the MOUs are also invalid without the interpretive issue that we've briefed, both of us. And what about the amendment, the estoppel argument? So the estoppel argument, fundamentally, estoppel is very rarely applied to governments. And when you look at their arguments for estoppel, it kind of boils down to a couple things. One, Gene Soroka, who's the executive director of the port, signed it. Two, the city attorney signed it. Three, they should have taken it to the board. There's more than that. He also says, and just to best you save your time, representation is that they were told that it was firmly represented orally, that it had been approved. What about that? When you actually read the allegations, they don't actually say it was approved. They say that it came up, it was discussed, and the board gave two thumbs up to go forward with further negotiations, including get the MOUs and the amendment signed and approved validly under the city charter. So when you say allegations, now you're referring to the allegations in the complaint. And what you're describing is allegations in the complaint as opposed to the arguments in litigation. Correct. Which is what we're based on in terms of a motion to dismiss. Assuming those are true, reading them, there wasn't any kind of indication that it was actually approved. If it had been approved by the board in closed session, could estoppel operate against the city? I don't think so. And if you take a look, there's two cases that are, and I'm running quickly out of time, so I'm going to point you to the cases. But there are two cases that are far more analogous than the HPTC case. The first case is First Street Plaza Partners versus City of Los Angeles. And it's cited in our brief, but the site is 65 Cal App 4, 650. And in that case, a developer sued the city after a city decided not to proceed with a project after the developer spent millions in negotiations and trying to get this project off the ground. Ultimately, the city decided, no, no, we're not going to do this. Just like here, developer sued, and the court did not apply estoppel in that case, even though they had spent millions, even though they had actually an agreement pretty much worked out, because ultimately the city council, which was required in that case, hadn't approved the agreement. Dynamic Industries Company versus City of Long Beach is another very analogous case, and that's 159 Cal App 2D 294. And in that case, you had another similar situation where they had an agreement worked out between an oil company and the City of Long Beach. The oil company spent millions to develop this piece of property, and the city ultimately said, wait, I can't do it. And they even had an agreement by the city manager that they agreed to the terms of the agreement. The city attorney had signed off the agreement, and ultimately because it hadn't met the requirements of the city charter, the court said, no, no, it's not valid, and there's no estoppel because you can't hold, in very rare circumstances, you're not to hold a city bound to an agreement. Before you sit down, what is the status of the ongoing state court litigation? It's ongoing, to say the least. So your client's a defendant? Correct, we're the only defendant. You're the only defendant. We're the only defendant. The case is being very aggressively litigated by HPAC, and it's limited to the ENA as well as to the permit and to an indemnity agreement. So the arguments relating to good faith and that, which really rise under the ENA, are being litigated in that case. Oh, and if you care, we have a trial technically in October. I don't think it's going to go in October, though. Anything further? Thank you so much for your argument. Thank you, Your Honors. And there's some rebuttal time. Could you put two minutes on the clock, please? We use quite a bit of counsel's time. I appreciate that, Your Honor. I was thinking I have a lot of wood to chop in a short amount of time, and I'll try to move through the questions. Go right ahead. I want to first address the last argument that opposing counsel was making with respect to the MOU and the cases that she was citing as to why Estavo can't apply in this situation. Unlike those cases, the executive director here did have authority to enter into agreements for at least a one-year period of time. In the cases cited by opposing counsel, the city had no authority to enter into some of those agreements. And in some of those cases, there weren't even agreements that had been signed. And I would also like to point to ER 102, paragraph 63 of our second amended complaint. It states the amendment was brought before the board in a closed session meeting. The board approved the amendment and the two MOUs. So what happened just quickly factually is the board chose or the court's executive director chose to bring the amendment and the MOUs before the board in closed session. We understand that. And it was actually approved. So I think unless there's more questions on the amendment, the MOU, or the section 1983 came, I would like to go back to focus on the North Pennington issues, which I think obviously are some of the trickier issues. Before you leave the contract issue, there is the alternative argument, which is that the document itself says there's not going to be damages, that you waive damages. What about that? Well, as we argued in our brief, that is not a valid exculpatory clause. And we have cases that are cited in our brief that show that that's not enough to disclaim all liabilities. Okay. If you're relying on the argument in your brief, we're familiar with that. So then I don't want to take any more of your time on that. You can turn back to North Pennington. That's fine. Yes, unless the panel has other questions. I'm happy to go back to that and address some of the issues that were raised by the unions council. One thing that the unions council had said in his argument is that we can't do a merits analysis here because it was lobbying. But that actually is not true. In this case, the union had no right to threaten to strike under both their collective bargaining agreement and under the law. They are prohibited from threatening strikes and striking against a secondary employer, which in this case would be both the port and HPEC. He's correct that there is no primary employer. So you cannot infer that their threat to strike is lawful. It can only be unlawful because at this point there is no primary employer. They're threatening secondary employers in order to put pressure to resolve their jurisdictional dispute. But they have no right to the project site. It's not waterfront, so it's not covered under the collective bargaining agreement. And they have no right to these jobs, which were historically performed by teensters and independent truckers. And that's all alleged in the complaint. So I do think that there can be a merits analysis. Counsel, in order to get to the merits analysis, in order to get to that scope of the sham exception, there's a threshold question about the type, the nature of the administrative body we're talking about. Could you speak to that, please? Sure. And it is difficult in this situation because it's sort of a mix. It's an administrative agency. I don't think it's an adjudicatory one because of the discretion that the board. So the union is arguing under Caudill, a Ninth Circuit case, that because it's not adjudicatory, sham can never apply. But I don't think that. He didn't say can never apply. We're talking about the scope of the sham exception, right? So if it's a narrow scope, then there's a problem for you because the union was really advocating for it, clearly advocating for its own interests, right? Except it was using unlawful means. That's the first answer to that. And then the second answer is I don't think that the law allows the union. Caudill isn't clear that the union is allowed to bar HBACs access to the board. It doesn't answer the question. It doesn't answer the question as to how that applies in an administrative agency because in that case, the Caudill plaintiff had not made those allegations. She had only made allegations that there had been misrepresentations. And if you look at the very end of the case, this court is saying she also alleged that unlawful means were used, but we don't know what those were. And since she didn't make specific threats, while we would be inclined to give her leave to amend, we don't know that she could say anything. That's different from this case. We've alleged what those unlawful means were. And it's not just threats. But if I could get in a word edgewise. You have, and I think we understand that part of your argument. It's really well briefed. But it's the threshold question, and I'm not sure it's even contested. And that is the nature of the body. And it seems to me, if I can focus your attention, that I think that opposing counsel is correct, but I want to hear your response if I'm wrong. That this analysis, that the nature of the body and the scope of the sham exception is really a function of whether it's really a function of the degree of discretion that the court had. So I'd really just like to hear your response to that. Yes, I agree with you, Your Honor. It does depend on what it is. And here it's an administrative agency. Right. It doesn't have this sort of discretion. It has discretion. It's not like a court where there's hearing. So given that, I appreciate both those points. And so given that, how do you get to the broader scope of the exception? I don't even think you need the broader scope of the exception, because I think this court has not said whether or not how it plays out in the administrative context, how you treat the access barring allegations. Because enfranchised realty, it was the same sort of thing. It was a permit board. They had discretion. It wasn't akin to an adjudicatory proceeding. This court left open. Had McDonald's said how the union had barred its access, it might have been a different situation. I think it's left open in enfranchised realty and in Caudill how it would be applied in this situation. And I agree it's unclear. You're well over the extra time that we've given you. And I apologize, Your Honor. Not at all. I took you over with my questions. But if you want to just take a few seconds to wrap up, you're invited to do so. I would urge the court to look at Brown and Root, because I agree with opposing counsel. Brown and Root is very analogous, but I think for a different reason. Threats accompanied by preparations for conduct do rise to a violation of Section 8B-4-2-i. So I think Brown and Root, I agree with them, is a very good case to look at. And in that case, the Nora Pennington issue was only in context of a lobbying that the employer asked the union to do. It wasn't coercive. If you read that case, it says very clearly there were no threats. There were no threats of protest, of labor disruption. It's undisputed here that there were. Thank you for your argument. Thank you all for your argument. I can't see all of you at the moment, but I know you're out there in the cyberspace. And we appreciate your argument. Mr. McNally is coming over. There he is. We appreciate your argument as well. And all of the briefing truly was very excellent. Thank you. Thank you so much, Your Honors. We'll take that case under advisement. And we'll go to the last case.
judges: CHRISTEN, BRESS, Lynn